IN THE MATTER OF THE TRUST ESTATE OF HAROLD L. COOK, UNDER THE LAST WILL AND TESTAMENT OF WILLIAM H. COOK, DECEASED.

*Sussex, Mar. 23, 1934.*

*James M. Tunnell,* for exceptant, Harold L. Cook.

*Frank M. Jones,* for the trustee.

THE CHANCELLOR: The exceptions challenge the propriety of certain investments made by the trustee under the will of William H. Cook, deceased. The will did not confer upon the trustee any special liberty of judgment in the management of the trust estate.

Whether a trustee has exercised the degree of care exacted of him by the duties of his office in the matter of investments and their retention, is a question which is to be answered in the light of contemporaneous circumstances, and not in the light of subsequent events. *Taft v. Smith,* 186 *Mass.* 31, 70 *N. E.* 1031; *Brown v. French,* 125 *Mass.* 410, 28 *Am. Rep.* 254; *Myers v. Zetelle,* 21 *Grat.* (*Va.*) 733.

A trustee is not a guarantor of the investments he makes. But he must observe a certain degree of care in the investment of the funds committed to his management upon peril of being held personally responsible for any neglect in that regard. What degree of care is exacted of him? The rule of a trustee's duty is generally stated to be, that he is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property.

When this rule which is applicable to a trustee's duty

generally is given specific application to the matter of investments, it needs, for the purposes of the instant case, to be supplemented by at least two observations.

The first is, that the external standard of "such care and skill as a man, of ordinary prudence would exercise in dealing with his own property" is not the standard he would use in dealing with his own property if he had only himself to consider; his "duty rather is" (quoting Lindley, L. J., in the case of *Re Whiteley*, 33 *Ch. Div.* 347, 355) "to take such care as an ordinary prudent man would take if he were minded to make an investment for the benefit of other people for whom he felt morally bound to provide." In other words he must take no risks which would not be taken by an ordinarily prudent man who is trustee of another person's property. *In re Buhl's Estate*, 211 *Mich.* 124, 178 *N. W.* 651, 12 *A. L. R.* 569; *Cornet v. Cornet*, 269 *Mo.* 298, 190 *S. W.* 333; *King v. Talbot*, 40 *N. Y.* 76; *In re Hart*, 203 *Pa.* 480, 53 *A.* 364; *In re Allis' Estate*, 191 *Wis.* 23, 209 *N. W.* 945, 210 *N. W.* 418. The court in *Mattocks v. Moulton*, 84 *Me.* 545, 24 *A.* 1004, 1006, in remarking upon the degree of care and prudence required of a trustee in the investment of trust funds, very correctly observed:

"He must always bear in mind that he is dealing with trust funds, which were * * * given him * * * to be guarded carefully and invested cautiously, so that principal, as well as interest, may be forthcoming at the appointed time. While he must be as diligent and painstaking in the management of the trust estate as the average prudent man is in managing his own estate, he may not always place the trust funds where he, or the average prudent man, would place his own funds. In measuring the duty of the trustee with the usual conduct of the man of average prudence in the care of his own estate, reference is to be had to the conduct of such a man in making permanent investments of his savings outside of ordinary business risks, rather than to his conduct in taking business chances. There are often occurring good business chances in which a man may invest some of his own money without danger of being called imprudent, whatever the result. But it will be generally conceded that a mere business chance or prospect, however promising, is not a proper place for trust funds."

The next observation to be made is, that the primary object to be attained by a trustee in the matter of investing the funds confided to his control is their safety. *Citizens' Nat. Bank v. Jefferson*, 88 *Ky.* 651, 11 *S. W.* 767; *Kimball v. Reding*, 31 *N. H.* 352, 64 *Am. Dec.* 333; *Davis v. Davis Trust Co.*, 106 *W. Va.* 228, 145 *S. E.* 588.

When the investments here objected to were made, there was a statute applicable to investments by trustees. *Revised Code* 1915, § 3875. That section was repealed in 1931 and another substituted therefor. 37 *Del. Laws, c* 259, § 1. The language of the statute in its original as well as in its present form is phrased in terms of permission. Being so, trustees are not now, as they were not before, absolutely required to invest the trust funds in the so-called "legals" enumerated in the statute. The effect of such permissive statutes is "that if trustees keep within the categories of investment named in the statute, they are afforded a protection against surcharge due to loss which, had they stepped outside the authorized classes of investment, they might well be made to bear." *Wilmington Trust Co., et al., v. Worth, et al.*, 19 *Del. Ch.* 314, 167 *A.* 848, 850.

The investments to which the exceptant objects in this case are four in number. None of them falls within any of the classes permitted by the statute. They are to be judged, therefore, on their own merits and their fitness as trust investments is to be tested in the light of the general principles above stated without the aid of any statutory prescription.

All four of the investments were in bonds. One was in the bonds of Equitable Office Building, the owner and operator of an office building in New York City. It was secured by a second mortgage. The other three investments were in the bonds of a utility holding company called American Water Works Company, the bonds of a railroad known as Atlantic Coast Line, and the bonds of a company called Childs Company, the operator of a chain of restaurants. These three investments were unsecured. They were not

better in point of security than would be debts under hand or even the claims of simple merchandise creditors. It was suggested at the hearing by one of the witnesses for the trustee that inasmuch as the Childs Company had covenanted not to place any mortgage lien upon its properties so long as any of the bonds of the character purchased by the trustee were outstanding, the bonds purchased had a status equivalent to that of first mortgage bonds. That view is completely unacceptable. The bonds themselves were secured by a lien upon nothing. The covenant would not have been breached by the obligor's issuing other unsecured obligations and incurring debts in other form without limit. Thus, there was neither security nor a limitation upon the volume of obligations which might share equally with the bonds in question in demands upon the resources of the obligor. Such a bond coupled with the covenant bears no resemblance to, and in no conceivable sense is the equivalent of, a first mortgage bond.

All the bonds were unsecured, except those of Equitable Office Building. And as to those, the security was only a second mortgage which was junior to a first mortgage securing a prior issue. It was not seriously contended at the hearing that the Equitable Office Building bonds were proper for the investment of trust funds.

The bonds of the four issues were selected by the trustee largely upon the recommendation of a broker. It appears that those of the Childs Company and American Water Works Company were given only a fourth rating by standard investment appraisers, while the Equitable Office Building bonds were given a sixth rating. I am of opinion that the trustee in the purchase of those bonds did not exercise that degree of care which an ordinarily prudent man would have exercised in the investment of funds belonging to another. The safety of the principal which should have been the first consideration was unreasonably exposed to jeopardy.

As to the Atlantic Coast Line bonds, while they were without the protection of security, yet they appear to have

been highly regarded at the time they were purchased. They enjoyed the most favorable rating. My conclusion with respect to them is that the trustee should not be taxed with their shrinkage in value.

Evidence was introduced at the hearing that the exceptant, the beneficiary, knew of the investments made by the trustee and made no objection thereto. This circumstance was shown, I take it, in order to raise an estoppel against the beneficiary based on consent. That consent of a beneficiary, under some circumstances, may afford protection to a trustee against the consequences of a breach of duty, may be conceded. But before exonerating consent can be made out, it must appear that the *cestui que trust* knew all the facts, was apprised of his legal rights, was under no disability and acted freely, deliberately and advisedly with the intention of confirming the transaction which he knew, or might or ought, with reasonable or proper diligence, to have known to be impeachable. *White v. Sherman,* 168 *Ill.* 589, 48 *N. E.* 128, 61 *Am. St. Rep.* 132. A trustee cannot relieve himself of the responsibility of an investment by the simple expedient of informing the beneficiary that the investment had been made. The *cestui que trust* is under no duty to act as adviser to his trustee. Consent, such as to foreclose the beneficiary from objecting, is not evidenced by failure to complain. Silence is not affirmation and approval. *Life Association of Scotland v. Siddel,* 3 *DeG. F. & J.* 58, 45 *Eng. Reprint,* 800; *Phillipson v. Gatty,* 7 *Hare,* 516, 68 *Eng. Reprint,* 213.

Let an order be prepared in light of the foregoing. The solicitors can doubtless agree upon its terms. Of course, in arriving at the sum with which the trustee is to be charged, the account being a final one, the loss on the securities herein held objectionable as investments will be abated to the extent of any increase in their quoted values which may have occurred on the date of settlement as contrasted with the values shown as of the date the account was stated.